# EXHIBIT 1

**LAW OFFICE OF DAVID M. HOFFMAN**
David M. Hoffman, Esq. (Attorney ID#199941962)
15A New England Ave.
P.O. Box 554
Summit, N.J. 07901
(908) 608-0333
dhoffman@david-hoffman-esq.com

**KRAEMER BURNS, P.A.**
John A. Avery, Esq. (Attorney ID#012061979)
David L. Menzel, Esq. (Attorney ID#003571973)
675 Springfield Avenue
Springfield, N. J. 07081
(973) 912-8700
javery@kraemerburns.com
dmenzel@kraemerburns.com

Attorneys for Plaintiff, John J. Davis

| | |
|---|---|
| JOHN J. DAVIS, individually and on behalf of all others similarly situated; | SUPERIOR COURT OF NEW JERSEY LAW DIVISION - MORRIS COUNTY Docket No. MRS-L-584-15 |
| Plaintiffs, | Civil Action |
| vs. | |
| CNO FINANCIAL GROUP, INC.; BANKERS LIFE AND CASUALTY COMPANY; NATHAN RICHARDSON; and ASMA NORRIS; | **AMENDED COMPLAINT and JURY DEMAND** |
| Defendants. | |

Plaintiff John J. Davis ("Davis"), residing at 177 Lake Drive West, Wayne, Passaic County, N.J. 07470, individually and on behalf of all others similarly situated ("Class Plaintiffs"), says:

## JURISDICTION and PARTIES

1.    Davis resides in Passaic County, New Jersey and on March 10, 2009 purchased Life Insurance Policy Number 340001740 ("Bankers Life Policy") from defendant Bankers Life and Casualty Company ("Bankers Life"), a wholly owned and totally controlled segment of defendant CNO Financial Group, Inc. ("CNO").

2.      Bankers Life does business in New Jersey from offices located at 7 Campus Drive, First Floor, Parsippany, Morris County, New Jersey 07054 ("Parsippany Office").

3.      Defendant Nathan Richardson ("Richardson") is a Bankers Life Regional Manager and the Manager of its Parsippany Office.

4.      Defendant Asma Norris ("Norris"), residing at 10 Highland Drive, Chester, Morris County, New Jersey 07930, is the agent and salesperson who, communicating with Davis on behalf of Bankers Life, CNO, and Richardson, sold the Bankers Life Policy to Davis in the State of New Jersey.

5.      CNO wholly owns, controls, and manages Bankers Life operations, and reports Bankers Life financial results as a segment of its reports and results listed on the New York Stock Exchange under "CNO".  CNO is headquartered at 11825 North Pennsylvania Street, Carmel, Indiana 46032.

6.      Bankers Life's home office is located at 600 West Chicago Ave., Chicago, Illinois 60654.

7.      Jurisdiction in the State of New Jersey and venue in Morris County are based on Plaintiff Davis' residence in New Jersey; Defendants CNO, Bankers Life, Richardson, and Norris doing business in New Jersey through Bankers Life's Parsippany Office located in Morris County, New Jersey; and Norris residing in Morris County, New Jersey.

## FACTUAL OVERVIEW

8.      Bankers Life and Richardson gave Davis' name to Norris to solicit the sale of additional and/or different insurance, regardless of Davis having any need or use for additional and/or different insurance, and regardless of the products being offered to Davis having any advantage to Davis, or suitable for him, as compared to his existing policies.

9.      At the time of his solicitation, Davis was retired and 70 years of age.

10.     Norris' solicitation of Davis was pursuant to protocols and procedures implemented by CNO, Bankers Life, Richardson, the Parsippany Office, Norris, and other Bankers Life employees and salespersons working out of other Bankers Life offices, to sell new Bankers Life policies and annuities regardless of whether such sales made economic or practical sense to their customers, and to make such sales by cancelling and replacing existing policies without regard to whether such cancellations and replacements made economic or practical sense to the customer.

11.     In its own literature, CNO states that Bankers Life is a leading provider of life insurance and annuities to retirees.

## THE FRAUDULENT SALE TO DAVIS

12.     On or about February 16, 2009, Davis was solicited by Norris to cancel two policies: (a) a fully paid up "single premium deferred life" policy with coverage of $98,000 written by Peoples Benefit Life Insurance Company with a cash value of over $64,000 ("Peoples Benefit Policy"), and (b) a "long term care" ("LTC") policy written by Metropolitan Life Insurance Company.

13.     Based on Norris' false and misleading representations, and omissions of material facts, Norris convinced Davis to cancel both policies.

14.     The LTC policy was reinstated immediately after comparison with its replacement by Davis and the LTC carrier revealed that the cancellation and replacement made no economic or practical sense for Davis.

15.     Norris misrepresented to Davis that surrendering the Peoples Benefit Policy and its cash value of $64,354.67 would fund a Single Premium Deferred Life Policy with a $200,000 benefit without the obligation to pay any additional premiums.

16.     Norris intended that Davis rely on her false representations and omissions of material facts, and Davis did rely thereon to his detriment.

3

17.   The new Bankers Life Policy was not as represented in that it was not a single premium policy, but instead required substantial annual premium payments.  Unknown to Davis, his $64,354.67 transfer to Bankers Life from his Peoples Benefit Policy only paid the initial Bankers Life Policy premiums and other charges, and that by the time he would likely most need the insurance protection that he was induced to purchase by Norris, from Bankers Life, there would be no protection available.

18.   Norris concealed from Davis that he would have to pay premiums to maintain the policy after the initial payment was exhausted.  Norris never showed him a policy summary or illustration.

19.   In fact, the amounts of the annual premiums to maintain the Bankers Life Policy were cost prohibitive, and would be payable when Davis was even more advanced in years and less able to pay them.  For example, his maximum annual premium would be $14,344.08 at age 80, $23,966 at age 85, and $33,348 at age 90.

20.   Because of Davis' age and life expectancy, and the steep increase in premium rates for each policy year, the Bankers Life Policy sold to Davis was unsuitable for his needs.

21.   Defendants CNO, Bankers Life, Richardson and Norris knew or should have known that the policy sold to Davis was unsuitable.

22.   Moreover, the policy sold to Davis would not accumulate any cash value. Given Davis' age, the $64,355 cash value in his Peoples Benefit policy would appreciate significantly.

23.   Norris, by various strategems employed with the connivance and complicity of Richardson, Bankers Life, and CNO, prevented timely delivery of the Bankers Life Policy to Davis and told Davis to ignore premium due notices he was receiving, telling him that the notices were issued by mistake.

24.     After making repeated inquiries to Bankers Life's home office, Davis discovered the fact of Norris' fraud during the summer of 2014, five years after the policy was issued, when two other Bankers Life employees finally delivered the Bankers Life Policy to Davis at his home in Wayne, New Jersey.  The late delivery of the policy was itself a violtion of New Jersey regulations which required delivery of the policy within 10 days of receipt by the producer.  A schedule that was part of the policy delivered to Davis showed the premium rates from which premiums due under the policy could be calculated.

25.     One of the two Bankers Life employees who delivered the Bankers Life Policy to Davis informed Davis that Norris was in trouble with the New Jersey Insurance Department and that there were 49 other victims of her improper sales practices.

### FRAUDULENT SALES PRACTICES: THE NEW JERSEY DEPARTMENT OF BANKING AND INSURANCE AMENDED ORDER TO SHOW CAUSE

26.     Attached as Exhibit A, is the 22-page Amended Order to Show Cause dated March 19, 2014 ("OSC E14-33") issued by the State of New Jersey Department of Banking and Insurance ("DOBI") and directed at Norris. OSC E14-33 details the misrepresentations, fraud, forgery, and other violations perpetrated by Norris, with the connivance and complicity of Richardson, Bankers Life and CNO, against nine (9) other victims of her sales practices.  OSC E-14-33 also details the sale of Bankers Life annuities by Norris which were unsuitable for the customer because of the customer's advanced age.  The connivance and complicity of Richardson, Bankers Life, and CNO is evidenced by their failure and refusal to implement the procedural and regulatory safe-guards, which were or should have been in place, to prevent victimization of the public by agents such as Norris and by their failure to compensate the victims.

27.     For example, Richardson, Bankers Life, and CNO became aware on or about August 24, 2009 of an egregious misrepresentation by Norris in 2008 in respect to an

insurance policy issued to "M.S.", the victim described in Count 1 of OSC E14-33 at pages 2-4. Bankers Life voided the policy issued to M.S. and refunded to her the premiums paid. But, Bankers Life apparently never acted to meaningfully monitor, discipline or discharge Norris and apparently never bothered to check the veracity and completeness of the applications she continued to submit, or the suitability of the annuities and policies she was selling.

28.     OSC E14-33 reveals complaints to Bankers Life about Norris' sales practices at least as early as February 2008, when a customer complained that in December 2006 Norris sold her an annuity by misrepresenting that the funds would be available for withdrawal at any time without penalty.

29.     Notwithstanding the number and seriousness of complaints about Norris' sales practices over many years, Bankers Life allowed Norris to continue to sell policies of life insurance and annuities, thereby putting customers at risk at least until May of 2012.

30.     While the OTC E14-33 reveals that in the case of "M.S." Bankers Life refunded the premium of $1,379.70, with respect to other claims, where the customers' payments to Bankers Life were more substantial, Bankers Life refused to make refunds, notwithstanding compelling evidence of Norris' wrongdoing.

31.     In Davis' case, Bankers Life declined to make him whole by providing him with a fully paid up policy with a $200,000 death benefit in consideration for the single premium he paid, as promised by its agent, Norris.

## VIOLATIONS OF NEW JERSEY INSURANCE REGULATIONS AND OF THE NEW JERSEY CONSUMER FRAUD ACT

32.     In 2004 DOBI adopted a set of Regulations ("Regulations", *N.J.A.C.* 11:4-2.1 *et seq.* with Appendices) to regulate insurers and producers.

33.     The protections afforded by the Regulations are intended to protect the interests of purchasers of life insurance policies and annuities when replacing existing policies and

annuities.  Among other things, the Regulations (a) establish minimum standards of conduct on the part of insurers and producers; (b) require that purchasers receive information to protect their interests; (c) reduce the likelihood of misrepresentation and incomplete disclosure; and (d) require insurers to monitor and police their producers to ensure their compliance with the Regulations.

34.    The Regulations are designed to prevent and control insurance companies' abusive practices of inducing consumers to trade in or "replace" their existing life insurance policies and annuity contracts for new, less suitable and/or less valuable arrangements, contrary to the interests of their customers.  The Regulations are also designed to prevent producers and insurers from being rewarded with commissions, premiums, and other charges that result from such abusive practices.

35.    The Regulations assign responsibility for the overall enforcement of the Regulations to any insurance company proposing to issue a life insurance policy or an annuity contract "replacement" as defined by the Regulations.  The Regulations prevent the inappropriate issuance of "replacement" policies and annuities by requiring that insurance companies proposing to do so, to clearly and effectively warn consumers of the pitfalls of replacing old insurance policies or annuities with new policies or annuities.  For example, under the Regulations, the proposed "replacement" insurer is responsible for making sure it has in hand a warning, substantially in the form of Appendix A to the Regulations ("Appendix A", annexed hereto as Exhibit B) acknowledged as having been received by the proposed insured, *before* issuing the "replacement" for any life insurance policy or annuity contract.    The basic application including specification of any replacement(s) and the particular prescribed form of Appendix A, are specifically and precisely designed to reveal and emphasize to applicants the reasons why replacement may be inadvisable.    The proposed "replacement" insurer is also required to provide written notification to the insurer

7

whose life insurance policy or annuity contract is being replaced, and to provide written notification to the insured of his right to rescind the new policy or contract within 30 days. This requirement provides the insurer being replaced with the opportunity to warn or counsel its existing customer within those 30 days.

36.     Davis never received a document like Appendix A.  Nor was he ever given a policy summary or illustration indicating the premium he would actually have to pay to maintain the Bankers Life policy.  Instead, Davis was falsely informed that the cash value of his existing policy was sufficient to completely fund the $200,000 death benefit of the Bankers Life policy.

37.     CNO and Bankers Life grossly violated the Regulations in respect to Davis and in respect to other New Jersey residents who purchased life insurance policy and/or annuity contract "replacements" between March 8, 2009 and March 10, 2015 by: first, failing to have in hand the prescribed documents, including Appendix A, or effectively presenting a substantially similar and approved substitute, as required by the Regulations, before issuance of the "replacement" life insurance policy or annuity contract; and second, by failing to properly notify the insurer being replaced so as to provide the requisite 30 day opportunity for the replaced carrier to consult with and coordinate the cancellation of the replacement(s).

38.     In addition to ignoring the violations of the Regulations by their producer employees and agents, CNO and Bankers Life have designed and implemented sales strategies and protocols to enable them to fraudulently gain access to vulnerable potential victims, namely the elderly.  Such sales strategies and protocols are fraudulently intended to sell "replacement" life insurance policies and annuity contracts by any means necessary, particularly by emotionally bludgeoning elderly prospects with their fears of illness, disability, or imposing burdens on their surviving family.

39.     For example, Bankers Life training sessions encouraged the sales of unsuitable annuities to vulnerable elderly purchasers where the annuities would not provide the elderly purchasers with suitable income to pay their living expenses.  The unsuitable annuities tied up the elderly purchasers' funds, frequently the bulk of their savings, during a period of life when the funds were needed by the elderly purchasers.  Indeed, funds could not be withdrawn from the annuities for a number of years without incurring substantial penalties. In other words, the elderly purchasers, who had present needs for the funds, would not likely survive to an age when they could access their funds without substantial penalty.

40.     As an additional example, Bankers Life sold to Davis a policy for which, given Davis' age and life expectancy, the premiums would be unaffordable, and Davis would be left with no coverage and the policy would have no cash surrender value.

41.     During the period from March 8, 2009 to March 10, 2015, CNO and Bankers Life failed to ensure that their producers and employees or agents, including but not limited to Norris and Richardson, selling life insurance policies or annuity contracts to New Jersey residents, participated in the proper presentation, completion, and execution of the "IMPORTANT NOTICE – REPLACEMENT OF LIFE INSURANCE OF ANNUITIES" as prescribed by *N.J.A.C.* 11:4-2 Appendix A or any equivalent.  All Defendants also failed to implement the other protective measures specified by *N.J.A.C.* 11:4-2, particularly the notification to the replaced insurers.

42.     Completion and execution of Appendix A is mandated, intended, and designed to prevent the fraudulent sale of life insurance policies and/or annuity contracts as replacements for existing arrangements previously put in place by the prospective purchasers.  The practice of failing to obtain a completed and executed Appendix A (or a substantially similar and properly approved equivalent) before selling, or selling by means of financing or re-financing, a replacement life insurance policy or annuity contract is a

fraudulent and deceptive consumer practice that violates the New Jersey Consumer Fraud Act ("NJCFA"), *N.J.S.A.* 56:8-1 *et seq.*

43.     As a result of the unlawful practices and the sale by Defendants of life insurance policies and annuity contracts between March 8, 2009 and March 10, 2015 to New Jersey residents without completion and execution of *N.J.A.C.* 11:4-2 Appendix A or a satisfactory and properly approved equivalent, such New Jersey purchasers have been defrauded and damaged.  Such sales practices and resulting sales also violate the NJCFA.

44.     Richardson and Norris are liable for their conduct affecting New Jersey consumers harmed by their actions, while CNO and Bankers Life are jointly and severally liable with them for actions affecting the universe of New Jersey consumers sold any replacement life insurance policy or annuity contract issued by Bankers Life between March 8, 2009 and March 10, 2015, or any life insurance policy or annuity contract which was unsuitable for the customer because of the customer's advanced age during that same period of time.

## CLASS ACTION ALLEGATIONS

45.     The Plaintiff classes are defined as:

A.      All New Jersey resident purchasers of a "replacement" life insurance policy or annuity contract, as covered by *N.J.A.C.* 11:4-2.1(b) and defined by *N.J.A.C.* 11:4-2.2, from Bankers Life between March 8, 2009 and March 10, 2015.

B.      All New Jersey resident purchasers of annuity or policy of life insurance from Bankers Life for whom, because of the purchasers' advanced age, the annuity or policy was unsuitable between March 8, 2009 and March 10, 2015.

46.     New Jersey Rule of Civil Procedure 4:32-1(a) sets forth four prerequisites to the maintenance of a class action, which are:

10

### (1)    The class is so numerous that joinder of all members is impractical.

It is impracticable to join all the New Jersey purchasers of Bankers Life or CNO products who were victimized by Defendants on or after March 8, 2009, because of their number and because of the current unavailability of their names and the location of their current residences makes their joinder impracticable.

### (2)    Questions of law or fact are common to the class.

The common core allegations, and the common basic questions of law and fact, which are the common concerns of all the members of the class, include: whether the Defendants made, concealed, failed to properly disclose, or were complicit in misrepresentations, forgeries, in violations of New Jersey Insurance statutes, regulations, the NJCFA, and/or common law, related to the marketing or sale of Bankers Life policies of life insurance and annuities; whether Defendants engaged in a course of conduct to sell policies of life insurance and/or annuities to customers for whom they were unsuitable because of the customers' advanced ages; whether defendants failed to adequately supervise its employees and agents in connection with the sales of policies of life insurance and annuities; whether defendants failed to properly investigate and/or discipline its producers of its life insurance and annuity products; whether defendants failed to reasonably investigate and redress complaints from customers of its life insurance and annuity products; whether defendants engaged in a common course to mislead customers for its life insurance and annuity products by affirmative misrepresentations or concealment of material facts.

### (3)    The claims of the named Plaintiffs are typical of the claims of the class they seek to represent.

The named Plaintiff, and class members, express claims against Defendants with similar characteristics, made under analogous circumstances, deceptive in basically the same fashion and violative of the New Jersey Consumer Fraud Act and New Jersey  statutes and

insurance regulations in basically the same way.  The claims of Davis and the OSC E14-33 claimants are typical of the claims of the class as defined hereinabove.

> **(4)     The named Plaintiffs will fairly and adequately represent the interests of the class.**

The named Plaintiff has diligently prosecuted the interests of the class he represents to date and has no interests adverse to the interests of other members of the class.  The interests of the class members coincide and do not conflict.

Plaintiffs' attorneys are competent and will adequately represent the interests of the class.  They are experienced in complex litigation and in significant class actions.  Plaintiffs' lead attorney, David M. Hoffman, Esq., to be complemented as appropriate, has over 50 years experience at the Bar and recently served as sole Lead co-Counsel in the Multi District Class Action against the Unum Group which resulted in about 800 Million Dollars, including fines and costs, being paid to over 10,000 members of the Plaintiff class.  See *In re: UnumProvident Corp. ERISA Benefits Denial Actions*, United States District Court for the Eastern District of Tennessee at Chattanooga, Case No. 1:03-md-1552 (CLC).

47.     In addition to satisfying the Rule 4:32-1(a) prerequisites, Rule 4:32-1(b) requires the satisfaction of sub-section (1), (2), or (3).  Plaintiffs clearly satisfy sub-section (b)(3):

### Rule 32(b)(3)

Questions of law or fact common to the members of the class predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### COUNT ONE
### (Contract)

48.     The preceding paragraphs are repeated.

49.     On March 10, 2009, Norris, as producer and agent on behalf of Bankers Life and CNO, entered into an agreement with Davis, then aged 70, providing for the cancellation of

Davis' existing $98,000 "single premium deferred life" policy with Peoples Benefit acquired in 1982 and the payment of its accrued $64,354.67 cash value to Bankers Life, in return for a Bankers Life "single premium deferred life" ("SPDL") policy with a $200,000 death benefit.

50.    In connection with the sale of the policy, Norris represented to Davis that Bankers life was a better company and would issue the new $200,000 SPDL policy to Davis in return for his surrender of the $64,354.67 of accrued value in his Peoples Benefit policy.

51.    Bankers Life breached its agreement by keeping the $64,354.67 of accrued value in the Peoples Benefit Policy and substituting an inferior policy, not a SPDL policy, requiring annual premium payments increasing from $3,300 in year 1 to $23,965.92 in year 16, when Davis would be 85 and most in need of insurance protection.

52.    As a result of the foregoing, Davis was damaged. The Class Plaintiffs were similarly damaged.

WHEREFORE, Plaintiffs demand judgment against defendants Bankers Life and CNO for:

a.    Damages against Bankers Life;

b.    Injunctive relief requiring Bankers Life and CNO to establish verifiable protocols to ensure that their agents and employees market and sell their products lawfully, honestly and with integrity;

c.    Injunctive relief establishing protocols to reliably monitor the Bankers Life and CNO honesty and integrity regime, and the personal conduct of Richardson and Norris;

d.    Prejudgment interest and costs; and

e.    Such other and further relief as may be deemed equitable and just.

## SECOND COUNT
### (Fraud)

53.    The preceding paragraphs are repeated.

13

54.     Norris, acting on behalf of Bankers Life and CNO, knew that her sales practices included intentional mistatements of material fact, and concealment of material facts, with the intention that Davis rely upon them.

55.     Davis reasonably relied on the mistatements of material fact and the failure to disclose material facts to him.  Had he known that the cash value of his prior policy would not totally fund his Bankers Life Policy, as represented to him, or the amount of premium he would have to pay over the life of the policy, he would not have surrendered his Peoples Benefit Policy and purchased the Bankers Life Policy.

56.     Norris, acting on behalf of, and with the connivance, complicity, and assistance of Richardson, Bankers Life and CNO, effected their marketing and sales efforts using fraudulent misrepresentations, forgery, and other violations of DOBI's Regulations as detailed in OSC E14-33 and their failure to utilize Appendix A, fraudulently victimizing the Class Plaintiffs in so doing.

57.     As a result of the foregoing willful, mailicious and wrongful conduct on the part of defendants, Davis and the Class Plaintiffs have been defrauded and damaged.

WHEREFORE, Plaintiffs demand judgment against defendants for:

a.      Damages;

b.      Punitive Damages;

c.      Injunctive relief requiring Bankers Life and CNO to establish verifiable protocols to ensure that their agents and employees market and sell their products lawfully, honestly and with integrity;

d.      Injunctive relief establishing protocols to reliably monitor the Bankers Life and CNO honesty and integrity regime, and the personal conduct of Richardson and Norris; and

e.      Prejudgment interest and costs; and

14

f.     Such other and further relief as may be deemed equitable and just.

## THIRD COUNT
### (New Jersey Consumer Fraud Act)

58.    The preceding paragraphs are repeated.

59.    The Defendants' misrepresentations, concealments and ommissions of material facts made with the intent that Davis and the Class Plaintiffs rely thereon, together with Defendants' violations of New Jersey statutes and regulations, constitute unconscionable, deceptive and unlawful sales practices in violation of the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8-1 *et seq.*

60.    The sale of policies of life insurance and annuities to customers for whom the policies and annuities were unsuitable because of the customers' advanced age, is an unconscionable sales practice in violation of the New Jersey Consumer Fraud Act.

61.    As a result of the foregoing, Davis and the Class Plaintiffs have been defrauded, damaged and have suffered ascertainable losses.

WHEREFORE, Plaintiffs demand judgment against defendants for:

a.    Damages;

b.    Treble Damages;

c.    Injunctive equitable relief requiring Bankers Life and CNO to establish verifiable protocols to ensure that their agents and employees market and sell their products lawfully, honestly and with integrity;

d.    Injunctive equitable relief establishing protocols to reliably monitor the Bankers Life and CNO honesty and integrity regime, and the personal conduct of Richardson and Norris;

e.    Attorney's fees and costs, including the costs of investigation and litigation; and

f.    Prejudgment interest;

g.    Such other and further relief as may be deemed equitable and just.

## FOURTH COUNT
**(Equitable Fraud)**

62.    The preceding paragraphs are repeated.

63.    Defendants had an equitable duty to accurately provide Davis and the Class Plaintiffs with all material facts and not to conceal material facts.

64.    Defendants breached this duty causing Davis and the Class Plaintiffs damages.

WHEREFORE, Plaintiffs demand judgment against defendants for:

a.    Rescission and restitution;

b.    Rescission damages;

c.    Injunctive equitable relief requiring Bankers Life and CNO to establish verifiable protocols to ensure that their agents and employees market and sell their products lawfully, honestly and with integrity;

d.    Injunctive equitable relief establishing protocols to reliably monitor the Bankers Life and CNO honesty and integrity regime, and the personal conduct of Richardson and Norris;

e.    Prejudgment interest and costs; and

f.    Such other relief as may be deemed equitable and just.

## FIFTH COUNT
**(Breach Of Fiduciary Duty)**

65.    The preceding paragraphs are repeated.

66.    Defendants owe a fiduciary duty to their customers, including, without limitation, Davis and the Class Plaintiffs.

67.    Defendants had a fiduciary obligation to not misrepresent, or to omit providing, material facts to their customers, and to act in their customers' best interests, including refraining from selling policies of life insurance or annuities which were unsuitable for the customer because of the customer's advanced age.

16

68.     Defendants breached their fiduciary duty to Davis and the Class Plaintiffs causing damages.

WHEREFORE, Plaintiffs demand judgment on against defendants for:

a.      Damages;

b.      Injunctive relief requiring Bankers Life and CNO to establish verifiable protocols to ensure that their agents and employees market and sell their products lawfully, honestly and with integrity;

c.      Injunctive relief establishing protocols to reliably monitor the Bankers Life and CNO honesty and integrity regime, and the personal conduct of Richardson and Norris;

d.      Attorney's fees and costs, including the costs of investigation and litigation;

e.      Prejudgment interest;

f.      Such other and further relief as may be deemed equitable and just.

**SIXTH COUNT**
**(Breach of Covenant Of Good Faith And Fair Dealing)**

69.     The preceding paragraphs are repeated.

70.     There is in every contract an implied covenant of good faith and fair dealing.

71.     Bankers Life's misrepresentations, nondisclosures, violations of law, evasions, other actions by Bankers Life's employees and/or agents constitute breaches of the covenant of good faith and fair dealing.  Bankers Life and its employees and/or agents acted dishonestly, deceptively and with a lack of good faith in their dealings with Davis and the Class Plaintiffs.

72.     Bankers Life breached this implied covenant of good faith and fair dealing in the sale of the policy of life insurance to Davis and the sale of life insurance policies and annuities to the Class Plaintiffs.

73.     As a result of the foregoing breaches of the implied covenant of good faith and fair dealing, Davis and the Class Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against defendant Banker's Life for:

a.      Damages;

b.      Injunctive relief requiring Bankers Life and CNO to establish verifiable protocols to ensure that their agents and employees market and sell their products lawfully, honestly and with integrity;

c.      Injunctive relief establishing protocols to reliably monitor the Bankers Life and CNO honesty and integrity regime, and the personal conduct of Richardson and Norris;

d.      Prejudgment interest and costs; and

e.      Such other and further relief as may be deemed equitable and just.

## SEVENTH COUNT
### (Respondeat Superior/Vicarious Liability)

74.     The preceding paragraphs are repeated.

75.     Defendants CNO and Bankers Life are liable for the acts and omissions of their agents and/or employees.

WHEREFORE, Plaintiffs demand judgment against defendants CNO and Bankers Life for:

a.      Damages;

b.      Prejudgment interest and costs; and

c.      Such other and further relief as may be deemed equitable and just.

## EIGHTH COUNT
### (Negligent Supervision)

76.     The preceding paragraphs are repeated.

77.     Defendants CNO and Bankers Life had a duty to Davis and the Class Plaintiffs to exercise reasonable care in the supervision of its producers.

78.     Regulations adopted by DOBI required that defendants take measures to ensure compliance with regulations applicable to the sale of replacement life insurance policies and annuities.

79.     Defendants had a duty to supervise producers to ensure that producers were not selling policies of life insurance and/or annuities to customers for whom the products were unsuitable because of the customers' advanced ages.

80.     Defendants CNO and Bankers Life negligently breached their duty to supervise their producers, including Norris.

81.     Defendants' breach of their duty to properly supervise was the proximate cause of Davis' and Class Plaintiffs' damages.

WHEREFORE, Plaintiffs demand judgment against defendants CNO and Bankers Life for:

a.      Damages;

b.      Prejudgment interest and costs; and

c.      Such other and further relief as may be deemed equitable and just.

## NINTH COUNT
### (Negligent Investigation)

82.     The preceding paragraphs are repeated.

83.     Bankers Life received a complaint of serious misconduct by its producer Norris as early as February 2008, and additional complaints of serious misconduct for years thereafter.

84.     Notwithstanding the number and seriousness of the complaints about Norris' sales practices, Bankers Life and CNO were negligent in not fully investigating the cases and/or failing to discipline and/or limit Norris' ability to defraud additional customers.

85.     The negligence of Bankers Life and CNO was the proximate cause of damages to Davis and the Class Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against defendants CNO and Bankers Life for:

a.      Damages;

b.      Prejudgment interest and costs; and

c.      Such other and further relief as may be deemed equitable and just.

## TENTH COUNT
### (Unjust Enrichment)

86.     The preceding paragraphs are repeated.

87.     As a result of the foregoing, Bankers Life has been unjustly enriched and Davis and the Class Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against defendant Bankers Life for:

a.      Damages;

b.      Prejudgment interest and costs; and

c.      Such other and further relief as may be deemed equitable and just.

LAW OFFICE OF DAVID M. HOFFMAN

By:_____
        David M. Hoffman


KRAEMER BURNS, P.A.

By:_____
        John A. Avery

DATED: April 2 , 2015                  Attorneys for Plaintiffs

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury as to all issues so triable.

LAW OFFICE OF DAVID M. HOFFMAN

By: _____
David M. Hoffman

KRAEMER BURNS, P.A.

By: _____
John A. Avery

DATED: April 2, 2015          Attorneys for Plaintiffs

## RULE 4:5-1 CERTIFICATION

The undersigned hereby certifies that to the best of their knowledge, the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, but further state that there is an Amended Order to Show Cause, Docket No. E14-33, presently pending before the State of New Jersey Department of Banking and Insurance. The undersigned further certifies that they know of no other parties which should be joined and acknowledges a continuing obligation to amend this certification if there is a change in the stated facts. Personal confidential identifiers have been and will be redacted in accordance with Rule 1:38-7(b).

LAW OFFICE OF DAVID M. HOFFMAN

By: _____
David M. Hoffman

KRAEMER BURNS, P.A.

By: _____
John A. Avery

DATED: April 2, 2015          Attorneys for Plaintiffs

21

## DESIGNATION OF TRIAL ATTORNEYS

David M. Hoffman, Esq., John A. Avery, Esq., and David L. Menzel, Esq. are hereby designated as Trial Attorneys.

LAW OFFICE OF DAVID M. HOFFMAN

By:_____
David M. Hoffman

KRAEMER BURNS, P.A.

By:_____
John A. Avery

DATED: April 23 2015                    Attorneys for Plaintiffs

22

# EXHIBIT A

ORDER TO SHOW CAUSE NO. E16-33

STATE OF NEW JERSEY
DEPARTMENT OF BANKING AND INSURANCE

IN THE MATTER OF:

```
                                      )
Proceedings by the Commissioner )
of Banking and Insurance, State )
of New Jersey, to fine,               )
suspend, and/or revoke the            )
insurance producer license of    )
Asma Norris, Reference No.            )
1001828                               )        AMENDED
                                      )    ORDER TO SHOW CAUSE
```

TO:   Asma Norris
      10 Highland Drive
      Chester, New Jersey 07930-3226

        THIS MATTER, having been opened by the Commissioner of
Banking and Insurance ("Commissioner"), State of New Jersey,
upon information that Asma Norris ("Respondent") licensed as a
resident individual insurance producer pursuant to N.J.S.A.
17:22A-26 et seq., may have violated various provisions of the
insurance laws of the State of New Jersey; and

        WHEREAS, Respondent was at all relevant times a
producer for Bankers Life & Casualty Company ("Bankers"); and

        WHEREAS, Respondent is subject to the provisions of
the New Jersey Insurance Producer Licensing Act of 2001,
N.J.S.A. 17:22A-26 et seq.; and

                              1

WHEREAS, pursuant to N.J.S.A. 17:22A-40a(2), an insurance producer shall not violate any insurance laws or violate any regulation, subpoena or order of the Commissioner; and

WHEREAS, pursuant to N.J.S.A. 17:22A-40a(5), an insurance producer shall not intentionally misrepresent the terms of an actual or proposed insurance contract, policy or application for insurance; and

WHEREAS, pursuant to N.J.S.A. 17:22A-40a(8), an insurance producer shall not use fraudulent, coercive or dishonest practices, or demonstrate incompetence, untrustworthiness or financial irresponsibility in the conduct of the insurance business; and

WHEREAS, pursuant to N.J.S.A. 17:22A-40a(10), an insurance producer shall not forge another's name to an application for insurance or to any document related to an insurance transaction; and

WHEREAS, pursuant to N.J.S.A. 17:22A-40a(16), an insurance producer shall not commit any fraudulent act; and

### COUNT 1 (Amended)

IT APPEARING THAT, on or about March 25, 2008, Respondent induced M.S. into purchasing a Ten Year Renewable

2

Convertible Term Life Policy by misrepresenting the instrument as a Universal Life Insurance Policy; and

IT FURTHER APPEARING THAT, Respondent failed to conduct a comprehensive policy review upon delivery of the Term Life Policy to ensure that M.S. understood the terms and conditions of the policy; and

IT FURTHER APPEARING THAT, Respondent admitted to Bankers that she represented to M.S. that the Term Life Policy was a Universal Life Policy; and

IT FURTHER APPEARING THAT, Respondent marked the policy as a Ten Year Renewable Convertible Term Life Policy on the policy application, which she signed; and

IT FURTHER APPEARING THAT, on August 24, 2009, following an internal investigation, Bankers voided the Term Life Policy and refunded M.S. all premiums paid towards the policy, totaling $1,379.70 in value; and

IT FURTHER APPEARING THAT, Respondent's misrepresentation of the nature and terms of the policy she sold to M.S. constituted violations of N.J.S.A. 17:22A-40a(2), (5), (8), and (16); and

IT FURTHER APPEARING THAT, Respondent's failure to conduct a comprehensive policy review with M.S. upon her

3

delivery to him of the Term Life Policy constituted violations of N.J.S.A. 17:22A-40a(2), (5), (8), and (16); and

### COUNT 2 (Amended)

IT APPEARING THAT, in or around December 2006, Respondent met with J.S. and induced her into purchasing a Bankers' Equity Indexed Annuity ("EIA") by making multiple oral and written material misrepresentations as to the nature of the instrument; and

IT FURTHER APPEARING THAT, Respondent misrepresented to J.S. that purchasing the EIA would make J.S. eligible for the Specified Low-Income Beneficiary Program ("SLMB"), a federal program that assists qualified individuals with the payment of Medicare premiums; and

IT FURTHER APPEARING THAT, Respondent misrepresented to J.S. that the funds held in the EIA would be accessible at any time without penalty; and

IT FURTHER APPEARING THAT, prior to purchasing the EIA, J.S. stated to Respondent that she would purchase the annuity only if the funds held in the EIA would be fully accessible without penalty and that making the purchase would aid in J.S.' qualification for the SLMB program; and

IT FURTHER APPEARING THAT, on December 7, 2006, respondent sold J.S. a Bankers' EIA by inducing J.S. to roll

4

over her Prudential IRA, valued at approximately $17,0000, into the EIA; and

IT FURTHER APPEARING THAT, the purchase of the EIA was unnecessary for purposes of qualifying for the SLMB Program and, following the purchase, J.S. still did not qualify for the SLMB Program; and

IT FURTHER APPEARING THAT, the Annuity Suitability Questionnaire ("ASQ"), which was part of the EIA application, reflects that Respondent knowingly placed an annuity for J.S. that was contrary to J.S.' stated interests and needs; and

IT FURTHER APPEARING THAT, in response to question 2 on the ASQ, which asks how the EIA will be funded, the following boxes are checked: "Stocks/Bonds" and "Mutual Funds"; and

IT FURTHER APPEARING THAT, in response to question 17 on the ASQ, which asks about the applicant's savings, the applicant is listed as having no "Stocks/bonds" or "Mutual Funds"; and

IT FURTHER APPEARING THAT, in response to question 22 on the ASQ, which asks "[h]ow much of your savings do you believe needs to be totally liquid and accessible for your use[,]" the answer given is: "All"; and

IT FURTHER APPEARING THAT, J.S. wrote Bankers a letter dated February 21, 2008, in which she complains about

5

Respondent's misrepresentations and requests that Bankers transfer her annuity, without penalty, from the EIA "to an IRA with a firm [she] can trust"; and

IT FURTHER APPEARING THAT, J.S.' signature on the ASQ differs from the signatures on the EIA's delivery receipt and J.S.' letter; and

IT FURTHER APPEARING THAT, on February 26, 2008, Bankers denied J.S.' request for a penalty-free transfer of the EIA; and

IT FURTHER APPEARING THAT, Respondent's misrepresentations to J.S. that purchasing the EIA would assist J.S. in qualifying for the SLMB program constituted violations of N.J.S.A. 17:22A-40a(2), (5), (8), and (16); and

IT FURTHER APPEARING THAT, Respondent's misrepresentations to J.S. that J.S. would have unfettered and penalty-free access to the funds held in the EIA constituted violations of N.J.S.A. 17:22A-40a(2), (5), (8), and (16); and

IT FURTHER APPEARING THAT, Respondent's forging of J.S.' signature on the ASQ and/or her misrepresentations of fact concerning J.S.' finances on the ASQ constituted violations of N.J.S.A. 17:22A-40a(2), (5), (8), (10), and (16); and

## COUNT 3

IT APPEARING THAT, Respondent induced F.B. into purchasing a Single Premium Deferred Fixed Annuity by misrepresenting the instrument as being equivalent to a Certificate of Deposit; and

IT FURTHER APPEARING THAT, in or around June 2008, Respondent contacted F.B. about renewing a CD that he owned; and

IT FURTHER APPEARING THAT, F.B. realized that the instrument Respondent intended to sell him was an annuity and not a CD; and

IT FURTHER APPEARING THAT, F.B. informed Respondent that he did not wish to purchase an annuity; rather, he wished to purchase a "CD with instant liquidity after 1 years as [he] anticipated a large expense in home repairs[]" at that time; and

IT FURTHER APPEARING THAT, in response to F.B.'s concerns, Respondent stated that the instrument she wished to sell him was a "Bankers Life version of a CD";

IT FURTHER APPEARING THAT, based on Respondent's misrepresentations as to the nature of the Bankers Fixed Annuity, F.B. agreed to accompany Respondent and her trainee, Jessica Locascio, to his bank in order to cash out his old CD, with a value of $53,284.33, to purchase the Bankers Fixed Annuity; and

7

IT FURTHER APPEARING THAT, F.B. later became aware that the Bankers Fixed Annuity was not a "version of a CD"; and

IT FURTHER APPEARING THAT, on June 9, 2009, F.B. submitted a complaint to the New Jersey Department of Banking and Insurance, in which he stated that he wished "to receive the full original value of [his] CD plus one year's interest as well as the bonus that was originally promised to [him]."; and

IT FURTHER APPEARING THAT, on June 22, 2009, the Department sent a letter to Bankers, demanding information concerning F.B.'s complaint; and

IT FURTHER APPEARING THAT, by letter dated July 14, 2009, Bankers responded to the Department's demand, in which it denied F.B.'s request that the company surrender the Bankers Fixed Annuity without penalty; and

IT FURTHER APPEARING THAT, Bankers' response letter contained a written and signed response from the Respondent dated July 9, 2009; and

IT FURTHER APPEARING THAT, in the Respondent's July 9, 2009 response, she stated that she had told F.B. that "[A]n annuity is like a CD with regards to the term period. The annuity has a better advantage during the term though because you can withdraw a certain percentage without penalty. . ."; and

8

IT FURTHER APPEARING THAT, on August 28, 2012, a Department investigator made contact with Jessica Locascio, Respondent's former trainee; and

IT FURTHER APPEARING THAT, Locascio stated that she recalls the Respondent telling F.B. that the Bankers Fixed Annuity was "just like a CD and that he could draw his money at any time without penalty."; and

IT FURTHER APPEARING THAT, Locascio also stated that Respondent would make material misrepresentations of fact concerning the terms and conditions of Bankers' annuities to her elderly clients as a matter of course in order to induce them to purchase these annuities; and

IT FURTHER APPEARING THAT, Respondent's misrepresentations to F.B. concerning the nature and terms and conditions of the Bankers Fixed Annuity constituted violations of N.J.S.A. 17:22A-40a(2), (5), (8), (16) and N.J.A.C. 11:17A-2.8; and

### COUNT 4 (Amended)

IT APPEARING THAT, Respondent induced B.B. into purchasing a Single Premium Deferred Fixed Annuity by misrepresenting the instrument as being a Certificate of Deposit; and

9

IT FURTHER APPEARING THAT, on or about June 30, 2008, as a result of Respondent's material misrepresentations concerning the nature of the instrument, B.B. agreed to and did purchase the Bankers Fixed Annuity for $36,075.50 by means of a direct transfer from her Hartford US Wealth Management account; and

IT FURTHER APPEARING THAT, B.B. later realized that the Bankers Fixed Annuity was not a CD nor did it function like one; and

IT FURTHER APPEARING THAT, on June 9, 2009, B.B. submitted a complaint to the New Jersey Department of Banking and Insurance, in which she stated that she had purchased what she had "thought was a fixed CD for a 1 year [term] from Agent Asma Norris and her associate Jessica Locascio."; and

IT FURTHER APPEARING THAT, in the June 9, 2009 complaint, she requested "to have the full original value of my variable annuity rollover plus interest and bonus refunded to me . . ."; and

IT FURTHER APPEARING THAT, on June 22, 2009, the Department sent a letter to Bankers, demanding information concerning B.B.'s complaint; and

IT FURTHER APPEARING THAT, by letter dated July 14, 2009, Bankers responded to the Department's demand, in which it

10

denied B.B.'s request that the company surrender the Fixed Annuity without penalty; and

IT FURTHER APPEARING THAT, Bankers' response letter contained a written and signed response from the Respondent dated July 9, 2009; and

IT FURTHER APPEARING THAT, in the July 9, 2009 response by Respondent, she stated that she "never told [B.B.] this was a CD."; and

IT FURTHER APPEARING THAT, Respondent's misrepresentations to B.B. concerning the nature and terms and conditions of the Bankers Fixed Annuity constituted violations of N.J.S.A. 17:22A-40a(2), (5), (8), and (16); and

### COUNT 5 (New)

IT APPEARING THAT, on or about June 22, 2010, Respondent submitted an application for a Fixed Deferred Bankers annuity on behalf of R.D.; and

IT FURTHER APPEARING THAT, on the annuity application, Respondent falsely represented that R.D. was seventy-seven years old when, in fact, he was eighty-seven years old; and

IT FURTHER APPEARING THAT, the maximum age for the annuity applied for was eighty-five; and

IT FURTHER APPEARING THAT, had Respondent supplied R.D.'s true age on the annuity application, R.D. would not have qualified for the annuity; and

IT FURTHER APPEARING THAT, as part of the annuity application, the applicant had to complete and sign an Annuity Suitability Questionnaire; and

IT FURTHER APPEARING THAT, on the Annuity Suitability Questionnaire, Respondent falsely represented that R.D. was seventy-seven years old when, in fact, he was eighty-seven years old; and

IT FURTHER APPEARING THAT, on the Annuity Suitability Questionnaire, Respondent falsely represented that R.D. had the following assets: 1) $24,000 in a Savings/Checking account, 2) $6,000 in a Money market account, and 3) $40,000 in CDs; and

IT FURTHER APPEARING THAT, R.D. did not possess and does not possess any of the above assets; and

IT FURTHER APPEARING THAT, Respondent's fraudulent representations on R.D.'s annuity application and Annuity Suitability Questionnaire constituted violations of N.J.S.A. 17:22A-40a(2), (8), and (16); and

12

## COUNT 6 (New)

IT APPEARING THAT, on or about June 18, 2012, Respondent submitted an application for a Modified Single Premium Deferred Bankers annuity on behalf of H.H.; and

IT FURTHER APPEARING THAT, in order to qualify for this annuity, the applicant's total assets, excluding his or her primary residence, must be equal to or greater than 50% of the initial premium payment; and

IT FURTHER APPEARING THAT, in order to qualify for this annuity, the applicant must have $25,000 or more in liquid assets after paying the initial premium, if liquid assets were the source of the initial premium; and

IT FURTHER APPEARING THAT, the initial premium for this annuity was $35,900; and

IT FURTHER APPEARING THAT, as part of the annuity application, the applicant had to complete and sign an Annuity Suitability Questionnaire; and

IT FURTHER APPEARING THAT, in response to the Annuity Suitability Questionnaire question that asks for "the source of funds for this annuity[,] Respondent checked the box labeled "CD," only; and

IT FURTHER APPEARING THAT, on the Annuity Suitability Questionnaire, Respondent represented that H.H. had the

13

following liquid assets: 1) $45,000 in a Savings/Checking account, 2) $65,000 in a Money market account, and 3) $35,900 in CDs and 4) $60,000 in "additional CDs"; and

IT FURTHER APPEARING THAT, H.H. did possess a $35,900 CD; however, she did not and does not possess any of the other above liquid assets; and

IT FURTHER APPEARING THAT, H.H. possessed only approximately $2,000 in her checking account at the time she purchased the annuity; and

IT FURTHER APPEARING THAT, had the Respondent supplied the true value of H.H.'s liquid assets at the time of the annuity's purchase, H.H. would not have qualified for the annuity; and

IT FURTHER APPEARING THAT, Respondent's fraudulent representations on H.H.'s Annuity Suitability Questionnaire constituted violations of N.J.S.A. 17:22A-40a(2), (8), and (16); and

### COUNT 7 (New)

IT APPEARING THAT, on or about October 12, 2012, Respondent submitted an application for a Deferred Bankers annuity on behalf of E.G.; and

14

IT FURTHER APPEARING THAT, on the annuity application, Respondent falsely represented that E.G. was seventy-seven years old when, in fact, she was eighty-seven years old; and

IT FURTHER APPEARING THAT, the maximum age for the annuity applied for was eighty-five; and

IT FURTHER APPEARING THAT, had the Respondent supplied E.G.'s true age on the annuity application, E.G. would not have qualified for the annuity; and

IT FURTHER APPEARING THAT, as part of the annuity application, the applicant had to complete and sign an Annuity Suitability Questionnaire; and

IT FURTHER APPEARING THAT, on the Annuity Suitability Questionnaire, Respondent falsely represented that E.G. was seventy-seven years old when, in fact, she was eighty-seven years old; and

IT FURTHER APPEARING THAT, on the Annuity Suitability Questionnaire, Respondent falsely represented that E.G. had 1) $450,000 in stocks, bonds, mutual funds, or brokerage accounts, and 2) a $12,000 life insurance policy; and

IT FURTHER APPEARING THAT, E.G. did not possess and does not possess any of the above assets; and

IT FURTHER APPEARING THAT, Respondent's fraudulent representations on E.G.'s annuity application and Annuity

15

Suitability Questionnaire constituted violations of <u>N.J.S.A.</u>
17:22A-40a(2), (8), and (16); and

### COUNT 8 (New)

IT APPEARING THAT, on or about March 21, 2012,
Respondent met with R.B. for the purpose of selling him a
Bankers' Indexed Deferred Annuity; and

IT FURTHER APPEARING THAT, on or about March 21, 2012,
R.B. completed and signed an application for the Bankers'
Indexed Deferred Annuity ("True Application"); and

IT FURTHER APPEARING THAT, on or about March 21, 2012,
R.B. wrote a check to Bankers for a premium payment of $310,000,
which check he gave to Respondent; and

IT FURTHER APPEARING THAT, on or about March 21, 2012,
R.B. made or was provided with a copy of the application for the
annuity; and

IT FURTHER APPEARING THAT, instead of forwarding the
application completed and signed by R.B. to Bankers' Home Office
for processing, Respondent sent a falsified application that
R.B. had not completed or approved ("False Application"); and

IT FURTHER APPEARING THAT, the False Application
contained a false name, date of birth, social security number,
address, and phone number; and

16

IT FURTHER APPEARING THAT, because Bankers had received and processed the False Application instead of the True Application, R.B. would not have been able to access the annuity, as it was issued for a fictitious person; and

IT FURTHER APPEARING THAT, on or about February 6, 2013, agents from Bankers' Special Investigations Unit ("SIU") met with R.B. to discuss the annuity; and

IT FURTHER APPEARING THAT, the SIU agents provided R.B. with a copy of the False Application; and

IT FURTHER APPEARING THAT, R.B. told the SIU agents that he had never seen the False Application before; and

IT FURTHER APPEARING THAT, R.B. produced a copy of the True Application for the SIU agents; and

IT FURTHER APPEARING THAT, Respondent's creation of the False Application, which contained numerous misrepresentations of fact, constituted violations of N.J.S.A. 17:22A-40a(2), (8), and (16); and

### COUNT 9 (New)

IT APPEARING THAT, on or about April 29, 2012, C.G.'s father passed away, leaving C.G. a Bankers' Modified Single Premium Annuity valued at approximately $360,000, which policy had been sold to C.G.'s father by Respondent; and

17

IT FURTHER APPEARING THAT, in or around May of 2012, C.G. called Respondent and informed Respondent of her father's death; and

IT FURTHER APPEARING THAT, during the same phone call, C.G. requested that Norris transfer the funds from her father's annuity into C.G.'s name; and

IT FURTHER APPEARING THAT, C.G. never met with Respondent to complete the forms necessary for the issuance of the annuity in her own name; and

IT FURTHER APPEARING THAT, Norris completed an application for the purpose of issuing an annuity in C.G.'s name using the funds from C.G.'s father's annuity; and

IT FURTHER APPEARING THAT, Norris forged C.G.'s signature on the application, the Required Taxpayer Identification and Certification Form, the Annuity Suitability Questionnaire, the Replacement of Life Insurance or Annuities form, the Annuity Disclosure Notice, the Withdrawal Charges Disclosure Form, the Beneficiary Annuity Claim form, and the Authorization to Transfer Funds form; and

IT FURTHER APPEARING THAT, in order to qualify for this annuity, the applicant's total assets, excluding his or her primary residence, must be equal to or greater than 50% of the initial premium payment; and

18

IT FURTHER APPEARING THAT, the initial premium for this annuity was $360,000; and

IT FURTHER APPEARING THAT, as part of the annuity application, the applicant had to complete and sign an Annuity Suitability Questionnaire; and

IT FURTHER APPEARING THAT, on the Annuity Suitability Questionnaire, Respondent represented that C.G. had the following assets: 1) $250,000 in real estate (excluding primary residence), 2) $110,000 in "Other Qualified Assets", 3) $18,000 in cash value from a life insurance policy, 4) $48,000 in savings/checking, 5) $15,000 in money market accounts, 6) $400,000 in stocks, bonds, mutual funds, or brokerage accounts, 6) $60,000 in CDs, and 7) $600,000 in "gold coins and bullion of gold inherited from dad"; and

IT FURTHER APPEARING THAT, C.G. did not possess any of the above assets; and

IT FURTHHER APPEARING THAT, in or around the time Respondent submitted the annuity application, C.G.'s assets consisted of approximately 1) $2,000 in a checking account, 2) $3,000 in a CD, and 3) the $360,000 annuity inherited from her father; and

19

IT FURTHER APPEARING THAT, on the Annuity Suitability Questionnaire, Respondent falsely listed C.G.'s approximate net annual income after taxes to be $180,000; and

IT FURTHER APPEARING THAT, C.G.'s approximate net annual income in or around the time Respondent submitted the annuity application was $39,000, plus approximately $41,000 in annual income from her husband; and

IT FURTHER APPEARING THAT, had Respondent supplied the true value of C.G.'s assets at the time of the annuity's purchase, C.G. would not have qualified for the annuity; and

IT FURTHER APPEARING THAT, Respondent's forging of C.G.'s signature on at least eight separate forms submitted to Bankers constituted violations of N.J.S.A. 17:22A-40a(2), (8) and (10); and

IT FURTHER APPEARING THAT, Respondent's fraudulent representations on C.G.'s Annuity Suitability Questionnaire constituted violations of N.J.S.A. 17:22A-40a(2), (8), (16) and N.J.A.C. 11:17A-2.8; and

NOW, THEREFORE, IT IS on this 19 day of MARCH 2014, 2013

ORDERED, that pursuant to the provisions of N.J.S.A. 17:22A-40a, Respondent shall appear and show cause why her insurance producer license shall not be revoked by the Commissioner; and

20

IT IS FURTHER ORDERED, that Respondent shall appear and show cause why the Commissioner should not assess fines not exceeding $5,000.00 for the first violation and not exceeding $10,000.00 for each subsequent violation, pursuant to the provisions of N.J.S.A. 17:22A-45c, due to her failure to comply with New Jersey's insurance laws and regulations; and

IT IS FURTHER ORDERED, that, pursuant to N.J.S.A. 17:22A-45c, Respondent shall appear and show cause why she should not be subject to additional penalties, including restitution to her victims and reimbursement of the costs of investigation and prosecution by the Department of Banking and Insurance; and

IT IS PROVIDED THAT, Respondent has the right to request an administrative hearing, to be represented by counsel or other qualified representative, at her own expense, to take testimony, to call or cross-examine witnesses, to have subpoena and subpoena duces tecum issued and to present evidence or argument if a hearing is requested; and

IT IS FURTHER PROVIDED THAT, unless a request for a hearing is received within twenty (20) days of the service of this Order to Show Cause, the right to a hearing in this matter shall be deemed to have been waived by the Respondent and the Commissioner shall dispose of this matter in accordance with

law.   A hearing may be requested by mailing the request to Virgil Dowtin, Chief of Investigations, New Jersey Department of Banking and Insurance, P.O. Box 329, Trenton, N.J. 08625 or by faxing the request to the Department at (609) 292-5337.   A copy of the request for a hearing shall also be sent to Deputy Attorney General Jason Silberberg at fax number (609) 777-3503. The request shall contain:

(A)   The licensee's name, address, and daytime telephone number;

(B)   A statement referring to each charge alleged in this Order to Show Cause and identifying any defense intended to be asserted in response to each charge. Where the defense relies on facts not contained in the Order to Show Cause, those specific facts must be stated;

(C)   A specific admission or denial of each fact alleged in this Order to Show Cause. Where the Respondent has no specific knowledge regarding a fact alleged in this Order to Show Cause, a statement to that effect must be contained in the hearing request. Allegations of this Order to Show Cause not answered in the manner set forth above shall be deemed to have been admitted; and

(D)   A statement requesting a hearing.

Peter L. Hartt
Acting Director of Insurance

22

# EXHIBIT B

New Jersey Administrative Code
  Title 11. Insurance
    Chapter 4. Actuarial Services (Refs & Annos)
      Subchapter 2. Life Insurance and Annuities Replacement (Refs & Annos)
        Appendix a

N.J.A.C. T. 11, Ch. 4, Subch. 2, App. A, 11:4-2 Appendix A
Currentness

## APPENDIX A

### IMPORTANT NOTICE

### REPLACEMENT OF LIFE INSURANCE OR ANNUITIES

**This document must be signed by the applicant and producer, if there is one,**

**and a copy given to the applicant.**

You are contemplating the purchase of a life insurance policy or annuity contract. In some cases this purchase may involve discontinuing or changing an existing policy or contract. If so, a replacement is occurring. Financed purchases are also considered replacements.

A replacement occurs when a new policy or contract is purchased and, in connection with the sale, you discontinue making premium payments on an existing policy or contract, or an existing policy or contract is surrendered, forfeited, assigned to the replacing insurer, or otherwise terminated or used in a financed purchase.

A financed purchase occurs when the purchase of a new life insurance policy involves the use of funds obtained by the withdrawal or surrender of an existing policy or by borrowing some or all of the policy values, including accumulated dividends, of an existing policy, to pay all or part of any premium or payment due on the new policy. A financed purchase is a replacement.

You should carefully consider whether a replacement is in your best interests. You will pay acquisition costs and there may be surrender costs deducted from your existing policy or contract. You may be able to make changes to your existing policy or contract to meet your insurance needs at less cost. A financed purchase will reduce the value of your existing policy and may reduce the amount paid upon the death of the insured.

We want you to understand the effects of replacement before you make your purchase decision and ask that you answer the following questions and consider the questions on the back of this form.

1.  Are you considering discontinuing making premium payments, surrendering, forfeiting, assigning to the insurer, or otherwise terminating your existing policy or contract? _____YES _____NO

2.  Are you considering using funds from your existing policies or contracts to pay premiums due on the new policy or contract? _____YES _____NO

Please list each existing policy or contract that you contemplate replacing (include the name of the insurer, the insured or annuitant, and the policy or contract number if available) and whether each policy or contract will be replaced or used as a source of financing:

| | INSURER NAME | CONTRACT OR POLICY # | INSURED OR ANNUITANT | REPLACED (R) OR FINANCING (F) |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |

Make sure that you know the facts. Contact your existing company or its producer for information about the old policy or contract. (You may request that an in force illustration, policy summary or available disclosure documents be sent to you by the existing insurer.) Ask for and retain all sales material used by the producer in the sales presentation. Be sure that you are making an informed decision.

The existing policy or contract is being replaced because

I certify that the responses herein are, to the best of my knowledge, accurate:

_____                    ......................................

Applicant's Signature and Printed Name                                      Date

_____                    ......................................

Producer's Signature and Printed Name                                       Date

I do not want this notice read aloud to me. _____ (Applicants must initial only if they do not want the notice read aloud.)

A replacement may not be in your best interest, or your decision could be a good one. You should make a careful comparison of the costs and benefits of your existing policy or contract and the proposed policy or contract. One way to do this is to ask the company or producer that sold you your existing policy or contract to provide you with information concerning your existing policy or contract. This may include an illustration of how your existing policy or contract is working now and how it would perform in the future based on certain assumptions. Illustrations should not, however, be used as a sole basis to compare policies or contracts. You should discuss the following with your producer to determine whether replacement or financing your purchase makes sense:

| | |
|---|---|
| PREMIUMS: | Are they affordable? |
| | Could they change? |
| | You're older. Are premiums higher for the proposed new policy? |
| | How long will you have to pay premiums on the new policy? On the old policy? |
| POLICY VALUES: | New policies usually take longer to build cash values and to pay dividends. |
| | Acquisition costs for the old policy may have been paid; you will incur acquisition costs for the new one. |
| | What surrender charges do the policies have? |
| | What expense and sales charges will you pay on the new policy? |
| | Does the new policy provide more insurance coverage? |
| INSURABILITY: | If your health has changed since you bought your old policy, the new one could cost you more, or you could be turned down. |
| | You may need a medical exam for a new policy. |
| | Claims on most new policies for up to the first two years can be denied based on inaccurate statements. |
| | Suicide limitations may begin anew on the new coverage. |

IF YOU ARE KEEPING THE OLD POLICY AS WELL AS THE NEW POLICY:

How are premiums for both policies being paid?

How will the premiums on your existing policy be affected?

Will a loan be deducted from death benefits?

What values from the old policy are being used to pay premiums?

IF YOU ARE SURRENDERING AN ANNUITY OR INTEREST SENSITIVE LIFE PRODUCT:

Will you pay surrender charges on your old contract?

What are the interest rate guarantees for the new contract?

Have you compared the contract charges or other policy expenses?

OTHER ISSUES TO CONSIDER FOR ALL TRANSACTIONS:

What are the tax consequences of buying the new policy?

Is this a tax-free exchange? (See your tax advisor.)

Is there a benefit from favorable "grandfathered" treatment of the old policy under the Federal tax code?

Will the existing insurer be willing to modify the old policy?

How does the quality and financial stability of the new company compare with your existing company?

**Credits**

Adopted by R.2004 d.414, effective November 1, 2004 (operative date January 30, 2005).

**CHAPTER EXPIRATION DATE**

<Chapter 4, Actuarial Services, expires on September 28, 2018.>

Current through amendments included in the New Jersey Register, Volume 47, Issue 7, dated April 6, 2015.

---

  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**LAW OFFICES OF DAVID M. HOFFMAN**
David M. Hoffman, Esq. (Attorney ID#199941962)
15A New England Ave.
P.O. Box 554
Summit, N.J. 07901
(908) 608-0333
dhoffman@david-hoffman-esq.com

**KRAEMER BURNS, P.A.**
John A. Avery, Esq. (Attorney ID#012061979)
David L. Menzel, Esq. (Attorney ID#003571973)
675 Springfield Avenue
Springfield, N. J. 07081
(973) 912-8700
javery@kraemerburns.com
dmenzel@kraemerburns.com

Attorneys for Plaintiff, John J. Davis

| | |
|---|---|
| JOHN J. DAVIS, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CNO FINANCIAL GROUP, INC., BANKERS LIFE AND CASUALTY COMPANY; NATHAN RICHARDSON; and ASMA NORRIS, <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION: MORRIS COUNTY <br> DOCKET NO:  L-000584-15 <br><br> *Civil Action* <br><br><br> **SUMMONS** |

From The State of New Jersey To The Defendant(s) Named Above:

CNO Financial Group, Inc.

Bankers Life & Casualty Company

Nathan Richardson

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil

Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.


_/s/ Michelle M. Smith_____
Clerk of the Superior Court

DATED:  April 27, 2015

| | |
|---|---|
| Name of Defendants to Be Served: | CNO Financial Group, Inc.; Bankers Life & Casualty Company And Nathan Richardson |
| Address of Defendants to Be Served: | c/o John M. Aerni, Esq.<br>Winston & Strawn LLP<br>200 Park Avenue<br>New York, New York  10166-4193 |

**LAW OFFICES OF DAVID M. HOFFMAN**
David M. Hoffman, Esq. (Attorney ID#199941962)
15A New England Ave.
P.O. Box 554
Summit, N.J. 07901
(908) 608-0333
dhoffman@david-hoffman-esq.com

**KRAEMER BURNS, P.A.**
John A. Avery, Esq. (Attorney ID#012061979)
David L. Menzel, Esq. (Attorney ID#003571973)
675 Springfield Avenue
Springfield, N. J. 07081
(973) 912-8700
javery@kraemerburns.com
dmenzel@kraemerburns.com

Attorneys for Plaintiff, John J. Davis

| | |
|---|---|
| JOHN J. DAVIS, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>CNO FINANCIAL GROUP, INC., BANKERS LIFE AND CASUALTY COMPANY; NATHAN RICHARDSON; and ASMA NORRIS,<br><br>     Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MORRIS COUNTY<br>DOCKET NO:  MRS-L--584-15<br><br>*Civil Action*<br><br>**NOTICE OF APPEARANCE** |

TO: Clerk, Morris County Courthouse
   Superior Court of New Jersey
   Civil Division
   Washington & Court Streets
   P.O. Box 910
   Morristown, NJ 07963-0910

SIR:

   **PLEASE TAKE NOTICE** that Kraemer Burns, P.A., 675 Morris Avenue,

Springfield, New Jersey 07081, hereby enters its appearance as co-counsel on behalf of

the plaintiff in the above captioned matter and requests that copies of all notices, pleadings and other papers in this matter be served upon it.

KRAEMER BURNS, P.A.

Dated:  April 27, 2015

By:_____
John A. Avery

David M. Hoffman, Esq.
LAW OFFICES OF DAVID M. HOFFMAN

Attorneys for Plaintiff

2